J-S46015-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN THE INTEREST OF: Z.D., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: S.D., MOTHER | No. 3264 EDA 2015 |

Appeal from the Decree October 21, 2015
In the Court of Common Pleas of Philadelphia County
Family Court at No(s):
CP-51-AP-0000613-2015
CP-51-DP-0000711-2014
FID: 51-FN-000686-2014

| IN THE INTEREST OF: Z.D., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: S.D., MOTHER | No. 3264 EDA 2015 |

Appeal from the Order October 21, 2015
In the Court of Common Pleas of Philadelphia County
Family Court at No(s):
CP-51-AP-0000613-2015
CP-51-DP-0000711-2014
FID: 51-FN-000686-2014

BEFORE: BENDER, P.J.E., OTT, J., and STRASSBURGER, J.[*]

MEMORANDUM BY BENDER, P.J.E.:                    **FILED AUGUST 09, 2016**

S.D. (Mother) appeals from the decree entered October 21, 2015, in the Court of Common Pleas of Philadelphia County, which involuntarily terminated her parental rights to her minor son, Z.D. (Child), born in

_____

[*] Retired Senior Judge assigned to the Superior Court.

December of 2013.[1]  In addition, Mother appeals from the order entered that same day, which changed Child's permanency goal to adoption.  After careful review, we affirm.

The trial court summarized the factual and procedural history of this matter as follows.

> On December 20, 2013, [the Philadelphia Department of Human Services (DHS)] received a General Protective Services (GPS) report alleging that the mother, [Mother,] and the child, [Child], tested positive for marijuana in the hospital.  Furthermore, they both tested positive for [b]enzodiazepine and opiates.  The benzodiazepine was administered by the hospital.  The child, [Child,] was admitted to the Neonatal Intensive Care Unit (NICU) for low Appearance, Pulse, Grimace, Activity and Respiration (APGAR) scores, respiratory distress and problems with feeding.  Moreover, the mother, [Mother,] did not have the necessary supplies for the child, [Child].  Lastly, the mother, [Mother], had a mental health diagnosis of depression.  The report was substantiated.
>
> On March 12, 2014, [Child] was admitted to St. Christopher's Hospital for Children for complications with breathing and low birth weight.  Furthermore, the child, [Child], was diagnosed with failure to thrive.  Moreover, DHS received a Child Protective Services (CPS) report alleging that [Mother] was not feeding the child properly and was not transporting the child to medical appointments.  She also was unable to make the formula for the child after having been properly instructed.  Additionally, [Mother] told a hospital worker that she felt like throwing the child [out] of a window.  [Mother] often became frustrated while

_____

[1] The trial court entered separate decrees involuntarily terminating the parental rights of Child's putative father, B.K., as well as the parental rights of any unknown Father that Child may have.  Neither B.K., nor any other alleged father, has filed an appeal from the decree terminating his parental rights.

feeding the child. The nurses at St. Christopher's Hospital for Children had no problem feeding [Child]. Furthermore, there was no medical explanation for the child's failure to thrive other than [M]other not feeding him properly. Moreover, [M]other had expressed suicidal and homicidal ideations to her case manager. Lastly, the report alleged that [M]other was unable to accurately assess the needs of the child. The report was indicated.

On March 15, 2014, the mother, [Mother], was admitted to Hahnemann University Hospital for mental health treatment and was released on March 21, 2014[,] with intensive outpatient services.

On March 24, 2014, DHS obtained an Order of Protective Custody (OPC) for the child, [Child], who remained at St. Christopher's Hospital for Children.

On March 24, 2014, DHS held a Family Service Plan (FSP) meeting. The objectives identified for the mother, [Mother,] were to: 1) meet weekly with Family School, 2) properly care for [Child], 3) participate in mental health evaluation and comply with all treatment recommendations and 5) visit and maintain regular contact with the child.

On March 25, 201[4], [Child] was discharged from St. Christopher's Hospital into the care and custody of DHS and placed in a foster home through Children's Choice . . . .

A shelter care hearing was held on March 24, 2014[,] before Master Lynne M. Summers. Master Summers lifted the OPC and ordered the temporary commitment of [Child] to the care and custody of DHS.

On April 3, 2014, an adjudicatory hearing was held before the Honorable Jonathan Q. Irvine. Judge Irvine adjudicated [Child] dependent and committed him to the care and custody of DHS.

Trial Court Opinion (TCO), 1/15/2016, at 1-2 (unnumbered pages).

On September 15, 2015, DHS filed a petition to involuntarily terminate Mother's parental rights to Child, as well as a petition to change Child's permanency goal to adoption. A termination and goal change hearing was

held on October 21, 2015. Following the hearing, the court entered its decree terminating Mother's parental rights, and its order changing Child's permanency goal to adoption. Mother timely filed a notice of appeal on October 28, 2015, along with a concise statement of errors complained of on appeal.

Mother now raises the following issues for our review.

A. Whether the trial court erred in involuntarily terminating the [M]other's parental rights where it was not supported by clear and convincing evidence when [M]other completed a substantial portion of her FSP goals?

B. Whether the trial court erred in involuntarily terminating [M]other's parental rights where [M]other had consistently visited her child and there was a bond between [M]other and Child and the termination of parental rights would have a negative effect on the developmental, physical and emotional needs of [C]hild?

Mother's brief at 5 (unnecessary capitalization omitted).[2]

We consider Mother's claims mindful of our well-settled standard of review.

_____

[2] In her brief, Mother purports to challenge both the termination decree and the order changing Child's permanency goal to adoption. Mother's brief at 4, 8-10, 14. However, Mother did not raise an issue with respect to the goal change order in her concise statement of errors complained of on appeal, nor did she include this issue in her statement of questions involved. Thus, Mother has waived any claim with respect to the goal change order. **See Krebs v. United Refining Co. of Pa.**, 893 A.2d 776, 797 (Pa. Super. 2006) ("We will not ordinarily consider any issue if it has not been set forth in or suggested by an appellate brief's statement of questions involved, and any issue not raised in a statement of matters complained of on appeal is deemed waived.") (citations omitted).

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the trial court terminated Mother's parental rights pursuant to Sections 2511(a)(1), (2), (5), (8), and (b). We need only agree with the trial court as to any one subsection of Section 2511(a), as well as

- 5 -

Section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Here, we analyze the court's decision to terminate under Sections 2511(a)(2) and (b), which provide as follows.

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> ***
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> ***
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

We first address whether the trial court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.[] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2)

such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted)).  "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct.  To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties."  *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

Instantly, the trial court found that Mother is incapable of parenting Child, and that Mother cannot, or will not, remedy her parental incapacity. TCO at 3-6 (unnumbered pages).  The court reasoned that Mother has failed to complete mental health and drug and alcohol treatment, and that Mother has continued to test positive for illegal drugs.  *Id.* at 3.  The court also concluded that Mother is in need of additional parenting instruction.  *Id.* at 4.

Mother argues that the trial court abused its discretion by terminating her parental rights because she has completed parenting instruction, and because she has participated in mental health and drug and alcohol treatment.  Mother's brief at 10.  Mother also stresses that she has visited with Child consistently.  *Id.*

After a thorough review of the record in this matter, we conclude that the trial court did not abuse its discretion.  During the termination and goal

change hearing, DHS presented the testimony of Turning Points for Children case manager, Janay Johnson. Ms. Johnson testified that Mother's primary FSP objectives were to obtain parenting instruction, mental health treatment, and drug and alcohol treatment. N.T., 10/21/2015, at 20.

Concerning Mother's parenting objective, Ms. Johnson acknowledged that Mother participated in parenting classes, and that she has attended her visits with Child consistently. *Id.* at 23, 32. However, Ms. Johnson testified that she does not believe that it would be safe to return Child to Mother's care, and that Mother is in need of "another parenting class or two" in order to "help her and assist her in redirecting [Child]." *Id.* at 24, 28.

With respect to Mother's mental health and drug and alcohol treatment, Ms. Johnson testified that Mother is supposed to be receiving treatment for both issues at the Consortium. *Id.* at 20-21. Ms. Johnson explained that she has not been able to confirm whether Mother is compliant with treatment. *Id.* Ms. Johnson has attempted to contact the Consortium, but she has not heard back.[3] *Id.*

Ms. Johnson further testified that Mother recently was ordered to complete five drug screens, but that Mother completed only three of the

---

[3] During the hearing, DHS presented several Clinical Evaluation Unit progress reports. *See* N.T., 10/21/2015, at 23, 33; DHS Exhibit 5. The progress reports indicate that Mother previously attended drug and alcohol treatment at Northeast Treatment Center, but that Mother was discharged from treatment on April 8, 2015 "due to non-compliance with treatment mandates." DHS Exhibit 5 at 5 (unnumbered pages).

requested screens. *Id.* at 21. Mother completed a drug screen on June 15, 2015, and tested positive for cocaine. *Id.* Mother completed a second drug screen on July 2, 2015, and tested positive for both cocaine and PCP. *Id.* Mother was asked to complete a drug screen on July 14, 2015, but she refused. *Id.* at 22. On October 6, 2015, Mother completed a third drug screen, which came back negative. *Id.* Finally, Mother was asked to complete a drug screen less than a week prior to the termination hearing, on October 16, 2015. *Id.* Ms. Johnson testified that, when asked to come in for the screen, Mother's response was, "basically that she did a screen last week and she did not understand why she would have to do another one." *Id.* Mother then claimed that she could not submit to a drug screen because "she had a program that day because I asked for it to be done before her supervised visit . . . [T]hen I was informed that she had food poisoning and wouldn't be able to come . . . to the visit either." *Id.*

Accordingly, the record supports the finding of the trial court that Mother is incapable of parenting Child, and that Mother cannot, or will not, remedy her parental incapacity. Mother has continued to test positive for illegal drugs as recently as July of 2015, and she failed to comply with a requested drug test less than a week prior to the termination hearing. It was proper for the trial court to conclude that Child should no longer be denied permanence and stability, as it is apparent that Mother is nowhere near being able to act as Child's caretaker. *See M.E.P.,* 825 A.2d at 1276 ("A child's life simply cannot be put on hold in the hope that the parent will

summon the ability to handle the responsibilities of parenting.") (citations omitted).

We next consider whether the trial court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(b). We have discussed our analysis under Section 2511(b) as follows.

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
>> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)) (quotation marks and citations omitted).

Here, the trial court found that terminating Mother's parental rights would be in Child's best interest, and that Child will not suffer irreparable

- 10 -

emotional harm if Mother's parental rights are terminated. TCO at 5-6. The court explained that Child is attached to his pre-adoptive foster Mother, and that he does not have a parent/child bond with Mother. *Id.* at 5. Mother argues that Child is bonded to her, and will suffer harm if her parental rights are terminated. Mother's brief at 12-13. Mother emphasizes that Child has only been in his current foster home for four months, and that Ms. Johnson only observed Child with his foster mother on one occasion. *Id.* at 12.

Ms. Johnson testified that Child has resided in his pre-adoptive foster home since July of 2015. N.T., 10/21/2015, at 25, 27-28. Ms. Johnson opined that Child has "a connection" with his foster mother, and that it would be detrimental to remove Child from his foster home. *Id.* at 25. Ms. Johnson acknowledged that she only visited Child's foster home once. *Id.* at 29. Ms. Johnson explained, however, that she also reviewed notes from the previous case manager, and discussed the issue with "the DHS nurse," who has observed Child with his foster mother. *Id.* at 30.

Concerning Child's relationship with Mother, Ms. Johnson stated, "I believe [Child] and [Mother] have a good relationship. I just don't see that parental bond." *Id.* at 24. Ms. Johnson noted that Child separates easily from Mother at the conclusion of visits. *Id.* at 24-25. Ms. Johnson opined that terminating Mother's parental rights would not be detrimental to Child, and that it would be in Child's best interest to be adopted by his foster mother. *Id.* at 25-26.

Thus, the record confirms that Child's needs and welfare would best be served by terminating Mother's parental rights, and that Child will not suffer irreparable harm if Mother's parental rights are terminated. Child has spent nearly his entire life outside of Mother's care, and Child and Mother do not appear to share a parent/child bond. Further, Child resides in a pre-adoptive foster home, and has a positive relationship with his foster mother.

Accordingly, because we conclude that the trial court did not abuse its discretion by involuntarily terminating Mother's parental rights to Child, we affirm the trial court's decree pursuant to 23 Pa.C.S. § 2511(a)(2) and (b). In addition, we affirm the order changing Child's permanency goal to adoption, as Mother has waived any challenge with respect to that order.

Decree affirmed. Order affirmed.
Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/9/2016